UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

AARON J. BULLIS,                    )
                                    )
        Plaintiff,                  )
                                    )
    vs.                             )        Case No. 4:15-CV-698 (CEJ)
                                    )
CAROLYN W. COLVIN, Acting           )
Commissioner of Social Security,    )
                                    )
        Defendant.                  )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I.    Procedural History

Plaintiff Aaron J. Bullis filed applications for disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, on November 26, 2012, and supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, on December 14, 2012, with an alleged onset date of August 12, 2011. (Tr. 217–29).[1] After plaintiff's applications were denied on initial consideration (Tr. 145–51), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 152–56).

Plaintiff and counsel appeared for a hearing on January 15, 2014. (Tr. 44–81). The ALJ issued a decision denying plaintiff's applications on February 6, 2014. (Tr. 25–43). The Appeals Council denied plaintiff's request for review on April 3,

---

[1] Plaintiff previously filed applications for disability insurance benefits and supplemental security income on June 23, 2008 and July 13, 2009, with an alleged onset date of April 19, 2008. (Tr. 200–16). After appearing and testifying at a hearing without counsel, the ALJ issued a decision denying plaintiff's July 13 applications on August 11, 2011, which the Appeals Council declined to review. (Tr. 115–34).

2015. (Tr. 1–7). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

## A. Disability Application Documents

In the Disability Report he completed on June 23, 2008 (Tr. 243–52), plaintiff listed his conditions as anxiety, depression, and schizophrenia, which he stated caused him to be an alcoholic and see or hear things. He had been employed as a restaurant manager for almost four years, working 14 hours a day, six days a week. This was his longest period of employment. His medications included Lexapro,[2] Rozerem,[3] Trazodone,[4] and Vistaril.[5] Plaintiff had completed three years of college as his highest level of education.

In a Function Report dated July 7, 2008 (Tr. 256–63), plaintiff wrote that his daily activities included taking medications, watching television, helping with yard work, laundry, and house cleaning, eating meals, sleeping, exercise, and going to bed. He was not responsible for taking care of anyone else or any pets, although he lived in a house with his family. Before the onset of his conditions, plaintiff wrote that he could maintain a job and form relationships with others. His conditions affected his sleep patterns, causing him to either have insomnia or

---

[2] **Error! Main Document Only.**Lexapro, or Escitalopram, is used to treat depression and generalized anxiety disorder. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Nov. 6, 2009).
[3] Rozerem, the brand name for Ramelteon, is a melatonin receptor agonist used to help patients with sleep-onset insomnia fall asleep more quickly.
https://www.nlm.nih.gov/medlineplus/druginfo/meds/a605038.html (last visited September 18, 2015).
[4] **Error! Main Document Only.**Trazodone is a seratonin modulator prescribed for the treatment of depression. It may also be prescribed for the treatment of schizophrenia and anxiety.
www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).
[5] **Error! Main Document Only.**Vistaril is indicated for the symptomatic relief of anxiety associated with psychoneurosis. See Phys. Desk Ref. 2217 (52d ed. 1998).

oversleep.  His personal care was not affected by his conditions, except that he needed reminders to bathe and brush his teeth.

Plaintiff prepared his own breakfast and lunch meals, including cereal, toast, grit, soup, and sandwiches.  His parents usually cooked dinner.  Prior to the onset of his conditions, plaintiff enjoyed cooking and preparing meals for others.  His household chores included mowing the lawn, doing the laundry, and washing dishes, which he did not need reminders to do.  Mowing took him fifteen minutes to an hour.  When going out, plaintiff either walked or rode in a vehicle with family. He could not drive since his license had been revoked for driving while intoxicated. He also could not go out alone because of his anxiety.  Plaintiff infrequently went shopping to buy clothes.  Plaintiff reported that he could not pay bills, but he could count change and use a checkbook.  Since the onset of his conditions, plaintiff's ability to handle money had changed in that he made impulsive purchases.

Plaintiff's hobbies and interests included fishing, drawing, and reading.  He now generally did everything less often, however.  Socially he attended twelve-step meetings a few times a week by himself.  Plaintiff wrote that his conditions had affected his memory, concentration, and ability to get along with others.  He often forgot things, was distracted easily, and felt he could not trust people.  Plaintiff could walk a mile before needing a 10 to 15 minute rest.  He could pay attention for 30 minutes to one hour.  Plaintiff finished what he started and followed written instructions fairly well.  He did not follow spoken instructions very well and avoided authority figures.  Plaintiff had never been fired or laid off from a job because of problems getting along with other people.  Plaintiff wrote that he handled stress very poorly and experienced a substantial amount of anxiety regarding changes in

routine. He feared unfamiliar places and people, which caused him nervousness and anxiety. Even after becoming sober, plaintiff continued to suffer from depression.

In Work Background Reports, plaintiff wrote that he had been unemployed since November 2008. (Tr. 265–68). Prior to that, he had worked as a customer service representative for a marketing company from March 2007 to November 2008. From January 2005 to September 2006, plaintiff worked in the kitchen and as front management for a catering company. From November 1995 to January 2005, plaintiff worked in food preparation, inventory control, and staff management at several restaurants or cafes.

In the Disability Reports plaintiff completed on July 19, 2012 and November 28, 2012 (Tr. 272–94), he listed his disabling conditions as "back," bipolar disorder, borderline personality disorder, "knees," and post-traumatic stress disorder. Plaintiff was 5′11″ and weighed 300 pounds. He listed his last day of employment as January 15, 2009. In a Field Office Disability Report dated November 26, 2012 (Tr. 282–84), the interviewer noted that plaintiff talked very slowly and in a low voice that made it difficult to hear him.

In a Function Report dated December 4, 2012 (Tr. 295–305), plaintiff wrote that he lived alone in an apartment. His daily activities consisted of preparing meals for himself, attending counseling and doctor's appointments, visiting family and friends, trying to keep himself and his surroundings clean, and occasionally grocery shopping. Before the onset of his conditions, plaintiff wrote that he used to be able to do many physical and mental activities, including walking long distances, bending easily at the knees and waist, attending school, making complex decisions,

and paying attention for long periods of time. Pain affected the quality and duration of his sleep. He had no problems with personal care, aside from slight wobbliness getting in and out of the bathtub. Plaintiff wrote that he needed special reminders to clean his apartment, shave, and use injections in his back and knees. The food he prepared daily included sandwiches, eggs, and potatoes. Since the onset of his conditions, he wrote that he had become less able to prepare complex or creative multicourse meals.

With regard to house work, plaintiff did his own laundry and dishes, although he found it difficult to stay motivated to do these tasks. He went outside daily, drove a car, and could go out alone. He shopped for fishing gear online, in-person, and over the phone. It took him longer than average to make shopping decisions, however. Plaintiff shared a banking account with his father, who paid plaintiff's bills for him. Plaintiff's hobbies included collecting knives, watching television, and spending time with friends. He spoke with friends on the phone and over the computer on a weekly basis and took them to the store with him. Plaintiff regularly went to medical and counseling appointments alone. He had difficulty maintaining his temper and concentrating on others' needs. Travel was difficult for him due to anxiety and fear.

Arthritis affected plaintiff's ability to lift, squat, bend, stand, walk, sit, kneel, and climb stairs. He could walk 100 yards before needing a 5 to 10 minute rest. Plaintiff's mental difficulties gave him a limited attention span, making it difficult to remember, complete tasks, concentrate, follow instructions, and get along with others. He could only pay attention for 15 to 45 minutes at a time and could not finish what he started. Plaintiff did not follow written instructions well and

repeatedly needed to refer back to instructions.  He also had difficulty following oral instructions.  In this report, plaintiff wrote that he had been fired or laid off from a job because of problems getting along with others—"too many [times] to count, over and over again," citing his library job, his catering company position, and a security job.

Plaintiff wrote that he handled stress "okay," but handled changes in routine poorly.  Night driving scared him.  He indicated that he used a cane, brace or splint, and glasses.  In a supplemental questionnaire, plaintiff wrote that he could use a computer and listen to music for a few hours at a time.  He stated that his condition had not improved since his first application for benefits.

In a Function Report dated December 14, 2012 (Tr. 306–16), plaintiff listed his daily activities as grooming, preparing quick and simple meals, picking up groceries, doing the dishes and laundry, ordering medications, going to counseling appointments, and watching television.  Prior to the onset of his conditions, plaintiff wrote that he was able to stand, walk, run, pay attention, and engage in complex tasks for a period of time.  His conditions affected the duration and quality of his sleep.  He did not have problems with his personal care, except for getting in and out of the shower.  Plaintiff needed repeated, verbal reminders to shave, unload the dryer and dishwasher, and take or reorder his medications.

Plaintiff wrote that he formerly was a confident chef, but now was afraid to use a knife.  He would "get lost in a task" and forget what step he was on with house work.  (Tr. 308).  When cooking, he repeatedly needed to look back at recipes.  His girlfriend reminded him to finish the laundry and rinse dishes.  Plaintiff went outside daily, drove a car, and could go out alone.  He shopped for camping

and fishing gear, knives, clothes, and groceries in-stores and online. Plaintiff shared a joint banking account with his father, and only independently paid for gasoline for his car and cigarettes. He felt overwhelmed by his bills. Reading, short walks, television, and spending time with his friends were his hobbies. He was successful with most relationships. Long distance travel was "out of the question" for him. (Tr. 310). Plaintiff interacted with caseworkers and close friends in-person and on the computer. He regularly met his parents for Sunday dinner. If family members began fighting and yelling, he would leave.

Plaintiff stated that he did not get along with his siblings and he had "no close friends other than doctors, therapists, and counselors." (Tr. 311). He was less independent and more lethargic since the onset of his conditions. Severe arthritis limited plaintiff physically, and he became frustrated easily. He could walk 100 to 200 yards before needing a ten minute rest, and could pay attention for 30 to 45 minutes. Plaintiff did not have any problems with authority figures, but wrote that he did not "click" with other employees or managers at restaurants at which he had worked. (Tr. 312). He used different coping skills to handle different, stressful situations. He needed to follow a routine to feel safe and comfortable. Plaintiff feared driving or riding in a vehicle for long distances and had "some OCD type behaviors." (Tr. 312). He used a cane, but it was not prescribed by a doctor. He used a brace when his knee swelled. His arthritis and mental illnesses in combination made life difficult.

Plaintiff's list of medications included Risperidone as an antipsychotic, Clonazepam and Hydroxyzine for anxiety, Meloxicam for arthritis pain, Gemfibrozil for cholesterol, Glimepiride and Metformin for diabetes, Ranitidine for GERD,

Amlodipine, Hydrochlorothiazide, Lisinopril, and Metoprolol for high blood pressure, Clonidine for both high blood pressure and anxiety, Divalproex Sodium as a mood stabilizer, Gabapentin and Hydrocodone for pain, Benadryl for sleep, Trazodone for sleep and depression, and a multivitamin as a supplement. (Tr. 327–28).

## B. <u>Testimony at the Hearing</u>

Plaintiff was 39 years old on the date of the hearing and lived alone in an apartment. (Tr. 52). Plaintiff's father also attended the hearing. (Tr. 48–49). In an opening statement, plaintiff's counsel stated that plaintiff lacked the mental residual functional capacity for work activity as a result of his mood and personality disorders. Drugs and alcohol were not material to plaintiff's condition. Despite plaintiff's sobriety, he struggled on and off with auditory hallucinations, mood fluctuations, anxiety attacks, panic attacks, mania, and difficulty sleeping. (Tr. 49–50).

Plaintiff's rent was paid by a grant from the Department of Mental Health and Barnes-Jewish Hospital. (Tr. 52). Prior to moving into the apartment, plaintiff had lived at Maple Ridge Residential Care, because his psychiatrist thought he needed more structure. He weighed 270 pounds, but had weighed 306 pounds on the date of the onset of his conditions. (Tr. 53). He gained weight when he was depressed, not eating well, and not exercising. Plaintiff had recently undergone lap-band surgery to lose weight.

Plaintiff had a driver's license, but only drove short distances. (Tr. 54). He was too anxious and nervous to be in a vehicle for very long. His father drove him to the hearing. Plaintiff had an associate's degree. He did not complete his bachelor's degree due to low self-esteem. (Tr. 55). Plaintiff testified that he last

worked as a cook at a restaurant in 2008. He worked there for six months before he was fired. (Tr. 56). His previous job at a marketing company had ended due to a combination of alcoholism and frustration. Plaintiff had also been fired from another job as an associate chef at a restaurant. A retail job ended because the employer did not have any hours available for plaintiff to work. (Tr. 57). At one point, plaintiff worked as many as three jobs at the same time. (Tr. 58). At a café he managed kitchen staff and learned Spanish quickly. (Tr. 58–59).

Plaintiff stated that he stopped working because he no longer had the physical abilities or mental capacity. (Tr. 59). Physically, his ankles, knees, hips and back bothered him. He also had difficulty sitting or standing for long periods of time. He could stand for six to ten minutes before he became dizzy. If he wanted to bend over and pick up something on the floor, he would need to use the wall as a brace. (Tr. 60). Plaintiff could not bend his knees past a certain point. When he went up or down stairs, plaintiff needed to hold on to both sides of the railing and take one step at a time. With respect to lifting, plaintiff could lift no more than half a gallon of milk. He stated that he had lost muscle tone in his arms and was weak.

Psychologically, plaintiff experienced depression, anxiety, and feelings of isolation. He had had problems with alcohol, but had experienced months-long periods of sobriety in the past two years. Plaintiff stated that he cried daily, had very low energy when he was depressed, and took naps during the day until he had the motivation to do something. (Tr. 63). On a typical night, plaintiff slept four to six hours. (Tr. 64). Other times, he slept for 12 hours straight. Once, during an anxiety attack, plaintiff was awake for 54 hours. He had anxiety attacks eight to ten times a month. During these attacks, his heart raced and the palms of his

hands became sweaty.  The attacks lasted until he took his medication.  He felt exhausted after the attacks were over.

In general, plaintiff's concentration was poor.  (Tr. 65).  He found it difficult to focus during a 30-minute television sitcom.   Twice a week plaintiff went to individual dual diagnosis treatment and dialectical behavioral therapy.  (Tr. 66).  He saw a psychiatrist every six weeks.   A nurse from Pyramid Home Health came to plaintiff's house to fill his medications once a week and a home health aide came three times a week to do plaintiff's dishes, laundry, and clean his floors.  (Tr. 67). Sweeping or mopping floors caused plaintiff's back to "tie[] up in knots."  On a typical day at home, plaintiff watched television and read magazines.  As a hobby, plaintiff collected knives.   (Tr. 68).   He used to do woodcarving, but stopped because it was hard on his fingers and too tedious for him to pay attention.

Upon questioning by the ALJ, plaintiff testified that he believed the cause of his physical pain was from being injured in "a couple of serious car accidents," playing football, and being on his feet 16 hours a day six days a week as a cook. With respect to the medications plaintiff took, he stated that some worked and others had side effects.   (Tr. 70).   His side effects included sleepiness, sleeplessness, diarrhea, upset stomach, headaches, and dizziness.   (Tr. 71). Plaintiff had had nine or ten epidural steroid injections and experienced relief for three to six months from those injections.  Difficulties moving around, squatting, bending, and walking were his biggest obstacles to working as a cook.  (Tr. 72). Plaintiff stated that he could not do sedentary work due to the side effects of his medications, which required him to get up and walk around for the blood to flow in his legs.

Plaintiff's mental impairments caused him to not get along well with others, including his siblings. He got along well with his parents. In reviewing plaintiff's work history, the ALJ noted that plaintiff worked in various food industry jobs where he was oftentimes the manager. His prior work as an associate chef, a cook, a security guard at a senior housing unit, and a kitchen manager were done in a standing position, and most of them were done at the light exertional level with regard to lifting. (Tr. 74, 76–77).

Vocational expert Tyra A. Bernard-Watts, Rh. D., C.R.C., characterized plaintiff's past relevant work as he performed it and as it was generally performed. (Tr. 77). Plaintiff's position as a security guard was semi-skilled at a light exertional level. His duties as a kitchen manager and cook were skilled with a light strength level. The ALJ posed a hypothetical question about the work ability of an individual who was limited to work at no greater than the light exertional level, could not climb ladders, ropes, or scaffolds, could only occasionally climb ramps and stairs, could only occasionally stoop, crouch, crawl, and kneel, was limited to simple, routine tasks, must avoid work involving intense interpersonal interaction, handling complaints of dissatisfied customers, and close proximity to coworkers. With those limitations, the vocational expert testified that such an individual would not be able to perform plaintiff's past relevant work. However, she opined that such an individual would be able to perform the duties of a garment sorter and a slot-tag inserter. (Tr. 78).

In a second hypothetical question, the ALJ asked Ms. Bernard-Watts to assume all of the limitations contained in the first hypothetical, but also to assume that the individual was limited to sedentary work. Ms. Bernard-Watts testified that

such a person could perform the duties of a weight tester and a stringing-machine tender. (Tr. 79). In a third hypothetical, the ALJ asked the vocational expert to assume that the individual additionally would be off task more than 20 percent of the workday. Ms. Bernard-Watts opined that this hypothetical individual could not perform any work that existed in the national economy. On cross-examination, plaintiff's counsel asked the vocational expert to return to the first hypothetical, and to add the limitation that, because of psychologically-based symptoms, the individual would miss three or more days of work a month. Ms. Bernard-Watts stated that such an individual would not be capable of performing any jobs.

## C. **Medical Records**

From December 23, 2006 to July 23, 2007, plaintiff received alcohol and drug treatment at the Southeast Missouri Community Treatment Center. (Tr. 331–33). Plaintiff was admitted to the program after losing his job as a chef due to drinking. His wife had kicked him out of the house, and he reported that he was getting a divorce. Plaintiff's treatment plan focused on his chemical substance dependency and relapse prevention. Plaintiff agreed to attend six hours of group therapy weekly. He met three times with a counselor, but failed to make any follow-up appointments. It was noted that plaintiff had a "poor prognosis due to him not keeping his appointments." (Tr. 333). In an office treatment record from Advanced Psychiatric Services dated April 26, 2007, plaintiff stated that he enjoyed work, was sober, and was doing better. (Tr. 329).

Treatment notes from JoAnn Franklin, MSN, RN, CS dated May 3, 2007 indicate that plaintiff was hospitalized in January because of a suicide attempt. (Tr. 413–14). Plaintiff reported that he worked two jobs at that time. He admitted to

having alcohol problems and problems with cravings. Nurse Franklin assessed plaintiff with hypertension, depression with alcohol abuse, and insomnia. She instructed plaintiff to monitor his blood pressure periodically. In psychiatric treatment notes dated May 24, 2007 (Tr. 330), plaintiff stated that he had nervous anxiety. At his next appointment with nurse Franklin on June 1, 2007, only one set of plaintiff's blood pressure records was normal out of all that he recorded. (Tr. 409–11). His mental status exam seemed to be within normal limits, and he denied drinking any alcohol. Nurse Franklin again increased plaintiff's hypertension medications.

Plaintiff had a follow-up visit with nurse Franklin on June 14, 2007. (Tr. 407–08). Based on lab tests, he was informed that his liver enzymes were extremely elevated due to his alcohol problem. The remainder of his labs had some abnormalities on the high side in the electrolyte category, which nurse Franklin noted was probably in relation to his drinking as well. Plaintiff was given a prescription for Vivitrol[6] at his request, which was expected to help with his alcohol problem. Plaintiff was given a Vivitrol injection intramuscular in his right hip at his appointment on June 28, 2007. (Tr. 405–06). He was also given Librium[7] for withdrawal symptoms after nurse Franklin consulted with Dr. Klemm. Plaintiff reported that he had quit drinking 16 hours ago and was developing the shakes. He currently had a good support system with his parents. Plaintiff sought a referral for a new psychiatrist.

---

[6] Vivitrol, or Naltrexone injections, are used along with counseling and social support to help people who have stopped drinking large amounts of alcohol to avoid drinking again. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a609007.html (last visited September 28, 2015).

[7] Librium, or Chlordiazepoxide, is used to relieve anxiety and agitation caused by alcohol withdrawal. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682078.html (last visited September 28, 2015).

At a follow-up appointment on July 5, 2007, plaintiff stated that he needed a work note because of withdrawal symptoms he had had and also needed a refill of Enalapril.[8] (Tr. 403–04). His blood pressure remained elevated. Nurse Franklin noted that the Vivitrol was supposed to work for four weeks and plaintiff was not supposed to drink with it. However, to test whether the medication worked or not, plaintiff placed a shot of vodka in eight ounces of water and drank it. He reported that his legs gave way and he experienced projectile vomiting. In addition to providing plaintiff a refill of Enalapril, nurse Franklin added Clonidine[9] 0.1 mg twice a day in an attempt to lower his blood pressure and also treat his addiction problems. At his appointment with nurse Franklin on July 12, 2007, plaintiff stated that he had not had any drinking episodes recently and denied any depression. His Enalapril and Effexor[10] prescriptions were refilled. Chantix[11] was also given to plaintiff to encourage him to stop smoking. He was told that walking half an hour a day would help with his blood pressure and pulse rate. Nurse Franklin scheduled plaintiff for a follow up in one week, because she thought he needed that for a support system.

On July 19, 2007, plaintiff saw nurse Franklin for a follow-up visit after being on Vivitrol for three weeks. (Tr. 399–400). He reported that he was still sober, feared drinking because of his use of Vivitrol, did not enjoy his customer service job

---

[8] **Error! Main Document Only.**Enalapril or Vasotec is used to treat high blood pressure. http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a686022.html (last visited on May 25, 2010).
[9] **Error! Main Document Only.**Clonidine is indicated for treatment of hypertension. See Phys. Desk Ref. 843 (61st ed. 2007). It is also used in the treatment of alcohol and narcotic withdrawal. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682243.html (last visited Mar. 9, 2011).
[10] **Error! Main Document Only.**Effexor, or Venlafaxine, is indicated for the treatment of major depressive disorder. See Phys. Desk Ref. 3196 (63rd ed. 2009).
[11] Chantix or Varenicline is a smoking cessation aid. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a606024.html (last visited September 28, 2015).

and that he had gotten in trouble for saying things that were overheard by quality assurance. He enjoyed cooking, had been fishing with his father, and went walking twice in the preceding week. Upon a review of plaintiff's systems, the nurse noted that plaintiff's blood pressure was well-controlled and he had been more active and social lately. Plaintiff reported feeling a lack of interest, which the nurse thought was a symptom of Effexor. Plaintiff was not interested in making any changes to his medications since he felt he had progressed. Chantix reportedly had helped him cut down to approximately eight cigarettes a day. Nurse Franklin encouraged plaintiff to continue getting Vivitrol injections every four weeks, continue using Chantix, set goals for job applications, decrease smoking, and increase exercise.

At his appointment with nurse Franklin on July 26, 2007, plaintiff had recorded some elevated blood pressure levels in his log, but the rest were within normal limits. (Tr. 397–98). He reported exercising on a regular basis and was not smoking at work since starting Chantix. Upon a mental status examination, the nurse noted that plaintiff appeared more verbal that day and also appeared to have been drinking alcohol. He was given a Vivitrol injection in his left hip. At his next appointment on August 2, 2007, plaintiff reported that he had drunk a small bottle of vodka the week before. (Tr. 395–96). When his blood alcohol content (BAC) indicated more recent use, plaintiff was "confronted about the lie."

On August 9, 2007, plaintiff reported that he began drinking the previous Sunday and missed work on Monday and Tuesday. (Tr. 393–94). Because he'd had a Vivtrol injection, he became ill after ingesting half a pint of vodka. Upon a mental status examination, nurse Franklin noted that plaintiff appeared somewhat insecure, had poor self-esteem, and was concerned about the way he looked.

Plaintiff had a follow-up appointment with Marianne Klemm, D.O. on August 15, 2007. (Tr. 391–92). Because he had reached his maximum insurance coverage, his Vivitrol injections were no longer covered. Plaintiff had missed several days of work and doubted he still had a job. He planned to look for another. Plaintiff understood that he should not be drinking. He told Dr. Klemm that Campral[12] decreased his urge to drink, but Vivitrol had not made a substantial difference. Dr. Klemm provided plaintiff a prescription for Ativan[13] 0.5 mg twice daily to help reduce the anxiety of his alcohol cravings.

At his appointment with nurse Franklin on August 23, 2007, plaintiff reported that he had drunk alcohol all last weekend and quit his job on Monday. (Tr. 389– 90). He experienced nausea and vomiting for three days and began having visual and auditory hallucinations. Upon examination, plaintiff was tearful, apologetic, had very low self-esteem, and felt that his Vivitrol injection should be given to someone who would benefit from it. He was not making any plans for his future. Nurse Franklin gave plaintiff a Vivitrol injection and told him it would be his last if he continued to drink.

Plaintiff's family brought him to the emergency room at Jefferson Memorial Hospital on August 23, 2007 for substance abuse issues. (Tr. 334–53). Plaintiff had been detoxing from alcohol and started having visual and auditory hallucinations. He had been hospitalized twice since December for similar issues. It was noted that plaintiff had smoked 1½ packs of cigarettes a day for 17 years.

---

[12] Campral or Acamprosate is used along with counseling and social support to help people with alcoholism to avoid drinking alcohol again.
https://www.nlm.nih.gov/medlineplus/druginfo/meds/a604028.html (last visited September 28, 2015).

[13] **Error! Main Document Only.**Ativan is a brand name for Lorazepam and is prescribed to treat anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682053.html (last visited on Aug. 29, 2007).

Early in his hospital admission, plaintiff stated that he saw someone in his room even though he knew no one was there. Two hours later, he was not in distress, took fluids without difficulty, and was calm and cooperative with his parents by his bedside. An hour later he was not in distress and ate a lunch box without nausea. Plaintiff was diagnosed with alcohol withdrawal, bipolar disorder, anxiety, acute psychosis, and schizophrenia. Plaintiff declined transfer to another facility. The severity of his symptoms warranted admission, but plaintiff did not pose a threat of imminent harm to himself or others. Plaintiff was given 10 mg of Valium[14] to take after his emergency room medications wore off. He was instructed to follow up with his psychiatrist, Dr. Klemm, in the morning.

At a follow-up appointment with nurse Franklin on August 30, 2007 (Tr. 387–88), plaintiff stated that he remained depressed. Dr. Klemm was consulted and it was noted that Ativan seemed to help plaintiff through stressful periods and helped him avoid drinking. As such, he was given a refill of Ativan. On September 6, 2007, plaintiff reported that he had had 19 days of sobriety, but nurse Franklin noted that the room smelled of alcohol. (Tr. 385–86). Plaintiff was very talkative and had not had any hallucinations as of late. He reported that he was feeling very depressed. His blood alcohol content was found to be 0.239. Because of his poor compliance, plaintiff was denied further Vivitrol injections. At his next appointment on September 13, 2007, plaintiff reported that he had greatly improved with the increase in his Wellbutrin[15] prescription from 75 mg to 150 mg daily. (Tr. 383).

---

[14] Valium or Diazepam is used to relieve anxiety, muscle spasms, and seizures, and to control agitation caused by alcohol withdrawal.
https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682047.html (last visited September 28, 2015).

[15] **Error! Main Document Only.**Wellbutrin, or Buproprion, is an antidepressant of the aminoketone class and is indicated for treatment of major depressive disorder. See <u>Phys. Desk Ref.</u> 1648-49 (63rd

Upon a review of plaintiff's systems, nurse Franklin noted that he had hypertension, tachycardia and continued problems with alcohol. Plaintiff appeared to be in a much better mood, and he reported that his sleep and concentration were better since he had obtained a job in the past week. Plaintiff's prescription for Clonidine was increased, labs were ordered, and Dr. Klemm gave a verbal order to renew plaintiff's Ativan prescription.

On October 11, 2007, plaintiff reported to nurse Franklin that his blood pressure was elevated. (Tr. 381–82). The nurse thought it was related to his Effexor being doubled. His Effexor was switched to Lexapro.[16] It was also recommended that plaintiff enroll in a 30-day treatment program because he continued to drink. His most recent drinking episode was the preceding Tuesday. One week after starting Lexapro, plaintiff told nurse Franklin that he still felt depressed. (Tr. 379–80). He also reported drinking one liter of vodka a day. He was openly intoxicated at the appointment. Plaintiff reported that he had quit his job as a dishwasher because "he could not take it anymore." (Tr. 379). Plaintiff did not seem motivated to stop drinking and his parents were frustrated with his behavior. Nurse Franklin doubled plaintiff's Lexapro dosage and instructed him to call and report where he was eligible to go for a treatment program. Plaintiff rejected two treatment facilities. On October 26, 2007, plaintiff's father reported to Dr. Klemm that plaintiff had been admitted to Southeast Missouri Mental Health Center. (Tr. 376).

---

ed. 2009). It may be prescribed under the brand name Zyban to help people stop smoking. <u>See</u> http://www.nlm.nih.gov/medlineplus/druginfo/meds/
a695033.html (last visited Sept. 22, 2010).
[16] **Error! Main Document Only.**Lexapro, or Escitalopram, is used to treat depression and generalized anxiety disorder. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Nov. 6, 2009).

Plaintiff remained at Southeast from November 8 to November 14, 2007. (Tr. 354–63). This was his third psychiatric hospitalization at this facility. Plaintiff requested help for his alcohol dependence. It was noted that he had spent ten days in another facility and had been discharged two weeks earlier. He stayed sober for one week. He was stopped while driving a vehicle and received a DWI violation. His license was suspended and he started binge drinking. His blood alcohol content was 0.231 when he arrived at Southeast. Plaintiff reported that he had had a long history of alcohol dependence and excessive drinking to the point of blacking out since he was 21-years old. Plaintiff also had a history of significant alcohol withdrawal which included delirium tremens, hallucinations, shaking, sweating, and confusion. He reported almost seven delirium tremens episodes in the past year since he had been trying to detox independently. He also reported progressive symptoms of depression over the past several years. Plaintiff reported poor sleep, fluctuations of appetite, and a sense of helplessness and hopelessness. He had been to several psychiatrists over the years, but did not follow up with them because he did not like them.

To treat his depression, plaintiff was given Trazodone[17] to improve his sleep and Lexapro to decrease his depression. He also began taking Risperdal.[18] He was encouraged to attend group therapy sessions. His group therapy attendance, participation and outcome were fair. He was also complaint with his medications, and by November 12 he displayed a bright affect. On discharge, plaintiff described

---

[17] **Error! Main Document Only.**Trazodone is a seratonin modulator prescribed for the treatment of depression. It may also be prescribed for the treatment of schizophrenia and anxiety. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

[18] **Error! Main Document Only.**Risperdal is the brand name for Risperidone and is indicated for the treatment of schizophrenia and acute manic or mixed episodes associated with bipolar I disorder. See Phys. Desk Ref. 1677 (61st ed. 2007).

his mood as good.  His affect was euthymic, form of thought logical and sequential, insight and judgment were fair, and he denied psychotic symptoms.  Plaintiff was diagnosed with alcohol dependence, alcohol withdrawal to rule out substance-induced mood disorder, exogenous obesity, elevated liver enzymes, substance abuse, legal issues, and occupational problems.  He was assigned a Global Assessment of Functioning (GAF) score of 60.[19]  He was given a two-day supply of Vasotec[8] 20 mg, Norvasc[20] 5 mg, Clonidine 0.3 mg, Trazodone 150 mg, Lexapro 10 mg, and was told to decrease Risperdal.  Counseling and Alcoholics Anonymous (AA) meetings were recommended.

On December 6, 2007, plaintiff reported being sober for 32 days and working at a restaurant three days a week.  (Tr. 373).  Upon objective examination, he was alert, cooperative, in a better mood, more confident, and had decreased anxiety.  On January 10, 2008, plaintiff reported that he had not drunken alcohol for eight days.  (Tr. 372).  He was still working at the restaurant and was getting more hours.  He had had two anxiety episodes since his last appointment.  His Norvasc and Trazodone dosages were increased.  He was also given a Vistaril injection and told to follow up in two months.  On March 6, 2008 (Tr. 369), plaintiff told Dr. Klemm that he was sober and had finished his counseling at Southeast Missouri Mental Health Center.  On May 7, 2008, plaintiff requested Librium from Dr. Klemm for relief from withdrawal symptoms.  (Tr. 367–68).  He stated that he had gone back to drinking multiple times before, but "this is the last time" he was ever going

---

[19] **Error! Main Document Only.**A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)."  American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

[20] **Error! Main Document Only.**Norvasc is indicated for the treatment of hypertension and coronary artery disease.  See Phys. Desk Ref. 2546 (61st ed. 2007).

to drink.  Plaintiff stated that alcohol had messed up his whole life and cost him his job.  He seemed more motivated than the last time Dr. Klemm had seen him.  Dr. Klemm wrote plaintiff a prescription for Librium and encouraged him to stay sober.

From June 11 to 14, 2008, plaintiff was admitted to a detox program at Gibson Recovery Center, Inc.  (Tr. 364–65).  He stated that he had drunk one liter of vodka a day.  Plaintiff was monitored every shift and his tremors began to subside.  He stated that he was eating fine, drinking fluids, and resting okay.  He attended some group therapy sessions and interacted well with peers and staff.  Upon discharge, plaintiff was referred to AA meetings and other outside support networks.  On June 26, 2008, plaintiff reported to medical providers that he had moved back in with his parents.  (Tr. 366).  He reported poor sleep and anxiety.

Joan Singer, Ph.D. completed a Psychiatric Review Technique for plaintiff on August 8, 2008.  (Tr. 415–25).  Dr. Singer assessed plaintiff with depression, anxiety disorder, and alcohol dependence, which she opined were not severe.  Plaintiff had mild limitations with respect to his restriction of daily living activities, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, and pace.  Plaintiff had had no repeated episodes of decompensation of an extended duration.  Dr. Singer noted that plaintiff had a long history of alcohol dependent and noncompliance with treatment.  Based on the evidence in the record, Dr. Singer found that plaintiff's impairments would be non-severe if he did not continue to use alcohol.  As such, plaintiff's alleged severity of his conditions was not found credible.

Per an integrated recovery plan from BJC Behavioral Health Center dated April 12, 2010 (Tr. 629–30), plaintiff was diagnosed with a mood disorder not

otherwise specified, alcohol and nicotine dependence, personality disorder not otherwise specified, obesity, hypertension, esophageal reflux, arthritis, substances use and limited coping skills. He was assigned a current GAF score of 50[21] and stated that he had been sober almost six months. A diagnosis summary report from BJC Behavioral Health dated June 21, 2010 diagnosed plaintiff with bipolar I disorder, most recent episode depressed, moderate, alcohol and nicotine dependence, obesity, hypertension, and esophageal reflux. (Tr. 577).

On August 26, 2010, plaintiff presented himself to the emergency department at Mineral Area Regional Medical Center with an anxiety attack. (Tr. 500–02). He was concerned about his current transition from Valproate[22] to Lamictal[23] for his bipolar disorder. Valproate had been effective in controlling his cycles of bipolar, but contributed to significant weight gain and dyslipidemia. He felt his current symptoms were consistent with a panic attack. Plaintiff was medicated with Lorazepam[24] 2 mg. Two hours later his mental status had improved and he was discharged.

Plaintiff returned to the emergency department on January 3, 2011 for suicidal ideation. (Tr. 496–99). He had both a plan and means and appeared depressed and anxious. Upon lab testing, his blood alcohol content was discovered to be 0.317. He was transferred for care at Saint Louis University Hospital. On

---

[21] **Error! Main Document Only.**A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social, occupational, or school functioning." American Psychiatric Association, <u>Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision</u> 34 (4th ed. 2000).
[22] Valproic acid is used to treat mania in people with bipolar disorder. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682412.html (last visited September 28, 2015).
[23] **Error! Main Document Only.**Lamictal, or Lamotrigene, is used to increase the time between episodes of depression, mania, and other abnormal moods in patients with bipolar disorder. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on December 17, 2014).
[24] **Error! Main Document Only.**Ativan is a brand name for Lorazepam and is prescribed to treat anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682053.html (last visited on Aug. 29, 2007).

January 28, 2011, plaintiff returned to the emergency room with complaints of depression. (Tr. 493–95). His blood alcohol content was 0.32. He reported feeling better after sobering up. The doctor encouraged plaintiff to return to AA in the morning. On February 5, 2011, plaintiff returned to the emergency department with psychiatric complaints. (Tr. 490–92). Plaintiff was positive for anxiety. There was no evidence of homicidal or suicidal thought. The doctor felt plaintiff could be appropriately discharged with office follow up. A prescription was written for Seroquel[25] and plaintiff was warned to stop smoking.

On February 15, 2011, plaintiff returned to the emergency room for suicidal ideation of a moderate intensity. (Tr. 486–89). He had drunk a pint of alcohol and was depressed. His blood alcohol level was 0.324. Plaintiff was medically cleared for psychiatric referral. Plaintiff was transferred to Poplar Bluff Regional. Plaintiff returned to the emergency room on February 22, 2011 for an intentional overdose of Trazodone and vodka. (Tr. 481–85). His blood alcohol level was 0.305. The doctor agreed that plaintiff's condition merited admission to the hospital and he was transferred to the intensive care unit. Plaintiff was again admitted to the emergency department for psychiatric purposes on May 24, 2011. (Tr. 476–80). Plaintiff's problems were noted to be related possibly to having his application for disability benefits denied or his relationship with his brother. After his last 9-day inpatient treatment for alcohol abuse at Poplar Bluff, plaintiff did not want to return there because "they have cold showers." His blood alcohol content was 0.3, which was too high for him to be accepted and transferred to a mental health facility.

---

[25] **Error! Main Document Only.**Seroquel is indicated for the treatment of acute manic episodes associated with bipolar I disorder and schizophrenia. See Phys. Desk Ref. 691 (61st ed. 2007).

After the third draw and ten hours after his admission to the emergency room, plaintiff's BAC was low enough for transfer to SLU.

On May 29, 2011 (Tr. 472–75), plaintiff was admitted to the emergency department at Mineral Area Regional Medical center for a suicidal gesture. His current symptoms included anxiety and acute intoxication. Plaintiff was tearful and stated he "just wanted it to end." His blood alcohol content was 0.2. Plaintiff was transferred to Kennett for inpatient treatment. Plaintiff returned to the emergency room for an injury and pain from a fall on June 13, 2011. (Tr. 469–71). Plaintiff appeared intoxicated and stated that he last drank vodka at 9 P.M. the night before. X-rays of plaintiff's chest, ribs, and cervical spine were normal. (Tr. 528–30, 816). On July 23, 2011, plaintiff returned to the emergency department with complaints of depression, stating he did not want to get to the point of suicidal ideation. (Tr. 466–68). His blood alcohol content was 0.203. An EKG was normal, and he was discharged three hours later.

On August 11, 2011, plaintiff told Lauren Flynn, a psychiatrist at BJC Behavioral Health, that he had remained sober since his last hospitalization. (Tr. 578–81). He had increased his attendance at integrated dual disorder treatment and would start volunteering twice a week in Parkland's dietary department to give his day more structure. Plaintiff had no psychiatric complaints that day. Per a mental status examination, plaintiff was well-groomed, cooperative, had a better affect and normal perception. Dr. Flynn diagnosed plaintiff with alcohol dependence, bipolar disorder type I, nicotine dependence, obesity, hypertension, GERD and hypertriglyceridemia. To treat plaintiff's alcohol dependence, Dr. Flynn

planned to continue Acamprosate[26] 666 mg three times daily and Naltrexone[27] 50 mg daily.  For his bipolar disorder, she instructed plaintiff to continue Depakote[28] 2000 mg and Risperdal 2 mg at bedtime.  For plaintiff's insomnia, she continued his prescription for Gabapentin 600 mg at bedtime.  Sleep study results on August 17, 2011 indicated that plaintiff did not have obstructive sleep apnea.  (Tr. 554).

Plaintiff was admitted to Mineral Area Regional Medical Center on September 5, 2011 for suicidal ideation.  (Tr. 463–65).  He stated that he did not have a plan, but felt a desire to kill himself.  Plaintiff appeared mildly anxious and had a flat affect.  His blood alcohol content level was greater than 0.3.  He remained in the hospital for approximately four days.  (Tr. 435–41, 538–41).  Plaintiff was treated with aggressive intravenous hydration, Librium on an as-needed basis for tremors and anxiety, and psychotherapy.  His final diagnoses on discharge included substance-induced mood disorder, alcohol dependence, status post-head injury, and a GAF score of 60.  His outpatient prescription medications included Depakote 2000 mg at bedtime, Risperdal 2 mg at bedtime, Librium 25 mg three times a day, Campral 333 mg three times a day, Naltrexone 50 mg daily, and Seroquel 150 mg at bedtime.  Plaintiff had attended and participated actively in all unit activities and was deemed safe for discharge by the whole treatment team.

At an appointment with his psychiatrist, Dr. Flynn, on September 15, 2011 (Tr. 582–84), plaintiff stated that his cravings for alcohol were still present but tolerable.  He was not attending AA meetings.  Because he had previously identified

---

[26] Acamprosate or Campral is used with counseling and social support to treat alcoholism. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a604028.html (last visited September 28, 2011).
[27] **Error! Main Document Only.**ReVia, or Naltrexone, is an opiate antagonist that blocks the effects of opioid medications.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a685041.html (last visited on Mar. 9, 2011).
[28] **Error! Main Document Only.**Depakote, or Valproic acid, is also used to treat mania in people with bipolar disorder.  www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

loneliness as a trigger for drinking alcohol, he wanted to get a dog.  He continued to volunteer in the dietary department at Parkland in an attempt to give his day structure.  Plaintiff complained of intermittent pain in his right ankle and toes of his right foot at night.  Dr. Flynn discussed with plaintiff that excessive alcohol could be a risk factor for gout.  On September 27, 2011, plaintiff requested and was provided a prescription for Klonopin[29] for travel on an upcoming fishing trip.

At a follow-up appointment with Dr. Flynn on September 29, 2011 (Tr. 586–88), plaintiff stated that he continued to participate in some therapy activities, but did not have any interest in AA.  He reported that his loneliness had improved somewhat lately.  He spoke of feeling overwhelmed with upcoming college classes and volunteer work.  He was generally sleeping well and denied any problems with medications.  The pain in his right ankle and foot had spontaneously resolved.  On October 13, 2011 (Tr. 589–91), plaintiff told Dr. Flynn that he had had a "good long week of mania" starting about two weeks ago.  For about 48 hours he did not sleep, felt restless, and "got a lot of stuff done" during that time period.  Plaintiff also made several calls to the BHR crisis hotline at that time.  After taking Seroquel, he "crashed" and awoke to his baseline.  Plaintiff denied alcohol consumption since his last visit and had been attending some therapy.  Dr. Flynn continued plaintiff on his medications for alcohol dependence, bipolar disorder, and insomnia.

At an appointment with Nona Mungle, F.N.P. at Great Mines Health Center on October 18, 2011 (Tr. 552), plaintiff complained of right leg numbness and knee pain.  An x-ray of plaintiff's right knee was normal.  (Tr. 563, 575, 777).  Mungle suggested plaintiff use a knee brace for support at home.  Plaintiff complained of

---

[29] **Error! Main Document Only.**Klonopin is a benzodiazepine prescribed for the treatment of seizure disorders and panic disorder.  <u>See</u> <u>Phys. Desk Ref.</u> 2782 (60th ed. 2006).

continued right leg numbness and low back to nurse practitioner Mungle on November 8, 2011. (Tr. 550–51). An x-ray of plaintiff's lumbar spine showed no obvious abnormalities. (Tr. 562, 576, 775). Mungle discussed weight loss with plaintiff.

At a follow-up appointment with Dr. Flynn on November 10, 2011, plaintiff reported that his knee swelling had subsided and pain improved. (Tr. 593–95). Dr. Flynn advised plaintiff to wait ten days after cessation of Norco to restart Naltrexone. Plaintiff stated that his mood was "leveling off" with an increased dose of Risperdal. He noticed some minor mood lability when driving recently and had called the BHR crisis hotline once since his last visit. Plaintiff denied alcohol consumption and stated that he had not had any cravings to use alcohol "in a long time." Plaintiff was attending therapy and reported no problems with medications.

An evaluation by Victor Brown, D.O., an orthopedic surgeon, found that plaintiff had right knee palpable internal derangement, but specifically lateral patellofemoral facet arthrosis. (Tr. 566). Dr. Brown planned to inject plaintiff's right knee with 80 mg of Depo-Medrol and place him in a two-button lock-out knee brace for protection and to maintain stability. Plaintiff would follow up after an MRI to determine the specific pathology of his knee. The MRI performed on November 23, 2011 revealed some notable tricompartmental osteoarthritis, particularly notable at the patellofemoral and lateral compartment of the right knee. (Tr. 531–32, 573–74). Dr. Brown planned to place plaintiff on chondroitin, sulfate, and glucosamine and Hyaluronic acid as well as omega-3 fatty acids. (Tr. 565). If plaintiff did not improve in six to eight weeks, he would call back to undergo an Orthovisc injection in his right knee.

On November 21, 2011, plaintiff reported increased irritability to Dr. Flynn since his last visit. (Tr. 596–98). He stated that his temper was high and he felt he might be headed toward a manic episode. Plaintiff frequently called the BHR crisis hotline, mainly to have someone to talk to. He denied any suicidal ideations or alcohol consumption since his last visit. Dr. Flynn noted that nurse Huff had recently reported that plaintiff seemed to smell of alcohol when he came to medical center one day. Plaintiff stated that he was "terrified to drink at this point," because of what had happened the last time he relapsed. Plaintiff was frequently attending therapy and denied any problems with medications.

Plaintiff consulted Tony Chien, D.O. for an examination for his low back pain on December 12, 2011. (Tr. 442–44, 655–57). The pain was not only located in his back, but also radiated to his right leg. His symptoms had progressively worsened and occurred both when he walked and climbed stairs. Upon physical examination, Dr. Chien noted pain with palpation over the spinous process and paraspinal muscles of the lumbar spine. There was pain with flexion and extension of the lumbar spine, spasm over the paraspinal muscles, and pain with palpation over the right sacroiliac joint. Dr. Chien noted that the x-ray of plaintiff's lumbar spine on November 8, 2011 revealed small anterior osteophyte changes throughout the lumbar spine, loss of normal lordotic curve, and no compression fracture. Dr. Chien assessed plaintiff with chronic low back pain, right sacroiliac joint dysfunction, right lower extremity radiculopathy, degenerative joint and disc disease of the lumbar spine, and chronic tobacco abuse. Dr. Chien recommended a caudal epidural steroid injection with a corticosteroid injection of the right L4 nerve root, to which plaintiff consented. (Tr. 505–06, 534, 643–44). Plaintiff was

instructed to not do any heavy lifting, pushing or pulling.  The doctor also provided plaintiff with Flexeril[30] to take at night.  Plaintiff was given a second caudal epidural steroid injection with a corticosteroid injection on December 19, 2011.  (Tr. 503–04, 533, 641–42).

At an appointment with Dr. Flynn on December 29, 2011 (Tr. 600–02), plaintiff thought his irritability had improved on an increased dose of Depakote, but he had gained ten pounds since his last visit.  He also told Dr. Flynn that he had been experiencing sexual dysfunction for the past several months.  Plaintiff stated he had drunken alcohol about two weeks ago for a period of two days.  He lied to his father about his relapse.  He called the BHR crisis hotline once since his last visit, but denied suicidal ideation.  Dr. Flynn increased plaintiff's Naltrexone and Depakote dosages.  At a follow-up visit with Dr. Chien for his low back pain, plaintiff reported improvement of symptoms after the two epidural injections.  (Tr. 654).  Dr. Chien told plaintiff he could participate in activities of daily living as tolerated and would follow up with plaintiff on an as-needed basis.

On January 26, 2012, Dr. Flynn noted that plaintiff's mood was "a little mellower."  (Tr. 603–05).  Plaintiff had been able to drive to a urologist appointment alone recently, which was significant for him.  He had had some "minor lows" lately, but no major mood disturbance.  The mild anxiety he experienced was mostly with respect to school.  Plaintiff had called the crisis hotline once in the past week, but he was not suicidal; rather, he had felt overwhelmed about preparing a speech.  Plaintiff denied any alcohol consumption since his last visit or any problems with his medications.  Dr. Flynn decreased plaintiff's Risperdal

---

[30] **Error! Main Document Only.**Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute musculoskeletal conditions.  <u>See</u> <u>Phys. Desk Ref.</u> 1832-33 (60th ed. 2006).

prescription as requested, due to sexual dysfunction. The doctor discussed other potential etiologies of plaintiff's sexual dysfunction with him, including use of a beta-blocker, alcohol, and psychogenic contribution. His insomnia was well-controlled. At his urologist appointment on February 16, 2012, Neal Neuman, M.D. noted that plaintiff had a history of alcoholism and diabetes, which could contribute to his erectile dysfunction. (Tr. 940–42).

On February 27, 2012, plaintiff complained of left knee pain, wheezing, and requested Klonopin to take during an upcoming fishing trip. (Tr. 544–45). Dr. Klemm allowed plaintiff only enough Klonopin for the duration of his trip. An x-ray of plaintiff's knee the next day showed fluid in the joint and bone spurs. (Tr. 459–62). From March 2 to 7, 2012, plaintiff was admitted for inpatient care in the psychiatric unit at Mineral Area Regional Medical Center for acute depression, alcohol abuse, and acute alcohol intoxication. (Tr. 426–34, 459–62, 536–37). His blood alcohol content level on admission was 0.243. Plaintiff stated that he had had thoughts of ending his life. His final diagnoses on discharge were bipolar I disorder with the most recent episode depression, post-traumatic stress disorder, alcohol dependence, hypertension, diabetes mellitus type II, and a GAF score of 40.[31] During his stay, plaintiff was compliant with his medications, which included Zoloft,[32] Campral, Depakote, Librium, and Risperdal. No side effects were reported. He attended all unit activities, including individual and group psychotherapy. He denied any auditory or visual hallucinations, but his insight and judgment were

---

[31] **Error! Main Document Only.**A GAF of 31-40 corresponds with "some impairment in reality testing or communication . . . OR  major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." American Psychiatric Association, <u>Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision</u> 34 (4th ed. 2000).

[32] **Error! Main Document Only.**Zoloft, or Sertraline, is a member of the SSRA class and is used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder.  It is also used to relieve the symptoms of premenstrual dysphoric disorder. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

grossly impaired. Plaintiff was instructed to continue with his same medications and follow up with Dr. Flynn on discharge.

On March 18, 2012, plaintiff was admitted to the emergency room with complaints of an anxiety attack and insomnia. (Tr. 457–58, 846–47). He had been sober for a week and thought his sleeping should have improved by that point. His physical examination was normal. Plaintiff was prescribed Zolpidem[33] and discharged. Plaintiff returned to the emergency room the next day with symptoms of an anxiety attack and nausea. (Tr. 454–56, 843–45). His physical examination was normal. Plaintiff was prescribed Clonazepam[34] and discharged. After midnight on March 25, 2012, plaintiff arrived at the emergency room intoxicated with a blood alcohol content level of 0.297. (Tr. 448–50, 836–38). His diagnoses included relapsed alcoholism and drug seeking behavior in the emergency room. Plaintiff was discharged and agreed to follow up with nurse practitioner Mungle. Plaintiff returned to the emergency room later that evening with complaints of depression. (Tr. 451–53). He had felt anxious over an impending school requirement and started to drink to ameliorate the emotion. It was noted that plaintiff was "well known" to emergency department staff and had health resources and professional support on a daily basis. Plaintiff had refused substance abuse treatment earlier that day. Plaintiff's father was with him and had disabled plaintiff's vehicle to keep him from driving. His BAC was 0.3 and he was positive for benzodiazepines. Plaintiff was diagnosed with acute alcohol intoxication and discharged in stable condition.

---

[33] **Error! Main Document Only.**Zolpidem is a sedative-hypnotic used to treat insomnia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693025.html (last visited on Sept. 1, 2011).

[34] **Error! Main Document Only.**Clonazepam, or Klonopin, is a benzodiazepine prescribed for treatment of seizure disorders and panic disorders. See Phys. Desk Ref. 2782 (60th ed. 2006).

On March 26, 2012, plaintiff returned to the emergency room for his third visit in three days with the same complaint of intoxication. (Tr. 445–47, 831–33). His blood alcohol content at that time was 0.264. Plaintiff was instructed to go to Southeast Missouri Treatment Center upon discharge. He was prescribed Hydroxyzine,[35] Librium, Reglan[36] and a multivitamin. At a follow up with nurse practitioner Mungle on April 3, 2012, plaintiff was instructed to follow up with a psychiatrist. (Tr. 543). Mungle also referred plaintiff to Dr. Brown for examination of his knee pain, who plaintiff saw on April 4, 2012. (Tr. 564). Plaintiff also complained of severe low back pain from sleeping in a recliner. MRI examinations of plaintiff's right knee had revealed some mild patellofemoral, medial and lateral compartment mild arthritis, mild chondrosis and some fissuring of the patellar groove, but otherwise no medial or lateral meniscal pathology or other internal knee derangement. Because of the migratory pattern of plaintiff's pain, Dr. Brown asked Mungle to run lab tests. If plaintiff's pain was not connective tissue disease pathology, the doctor planned to continue to treat plaintiff conservatively, including Orthovisc injections to his knees as needed. Plaintiff's lab tests were within normal ranges, and plaintiff was referred to a rheumatologist. (Tr. 568, 571).

At his appointment with Dr. Flynn on April 16, 2012, plaintiff had a depressed mood and irritated tone. (Tr. 602–12). At the time, plaintiff was no longer taking opioid medication for his back pain and instead was only using ibuprofen. Due to plaintiff's problems with alcohol dependence, Dr. Flynn told plaintiff he had one of

---

[35] **Error! Main Document Only.**Hydroxyzine is used to relieve the itching caused by allergies and to control the nausea and vomiting caused by various conditions, including motion sickness. It is also used for anxiety and to treat the symptoms of alcohol withdrawal. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 28, 2009).
[36] Reglan, or Metoclopramide, is used to relieve symptoms caused by slow stomach emptying in people who have diabetes. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a601158.html (last visited September 30, 2015).

three options: go to Daybreak, move into a residential care facility for six months, or move back in with his parents.  The doctor explained that she thought they could substantially mitigate his suicide risk with these options, because plaintiff typically became suicidal when he was drunk but not at any other time.  If plaintiff had closer supervision, the doctor thought the risk of his drinking was much lower than while he lived independently.  Plaintiff told Dr. Flynn that he was not ready to commit to any of the three options at this time.  Dr. Flynn told plaintiff that while the decision was his to make, his unwillingness to address his alcohol dependence in any significant way lent even more credence to the severity of his alcohol.  As such, the doctor would change his primary problem listed in his record to alcohol dependence, which would make his ineligible for some medical funding.  She discussed with plaintiff that the overwhelming majority of his BJC BH care with respect to the time and energy of the medical staff had been devoted to his alcohol dependence and not his bipolar disorder.  Plaintiff responded that he felt coerced into one of the three aforementioned options.  Dr. Flynn noted that their current approach was not working well enough to maintain the status quo.  Plaintiff stopped seeing Dr. Flynn after this appointment.

At his next urologist appointment on May 17, 2012, Dr. Neuman noted that plaintiff's testosterone levels were within normal limits and opined that plaintiff was having performance anxiety.  (Tr. 938–39).  On May 25, 2012, plaintiff was sent to Potosi Rural Health Clinic after a relapsing on alcohol in a three-day binge.  (Tr. 616–17).  He was depressed, labile, irritable, and had an elevated and eurythmic mood.  Plaintiff was assessed with bipolar disorder, depressed, alcohol dependence, knee pain, and a GAF score of 50.  Plaintiff returned to Dr. Chien for a check-up of

his back on August 14, 2012.  (Tr. 651–53).  Plaintiff stated that the pain radiated to both hips and was worse when he walked for long distances.  Plaintiff had been using Vicodin for the pain.  Epidural injections in the past seemed to provide good relief of his symptoms.  As such, Dr. Chien recommended a caudal epidural steroid injection with corticosteroid injection of the right L4 nerve root.  Plaintiff returned to Dr. Chien on August 22 and 28, 2012 and received additional caudal epidural steroid injections.  (Tr. 637–40, 822–30).

In BJC Behavioral Health records summarized September 24, 2012, it was noted that plaintiff began attending substance abuse group therapy meetings in October 2010 and had been attending on average three times a week, up to and including present time.  (Tr. 848–62).  In addition, he had also received individual counseling once a week for substance abuse beginning in October 2010.  Plaintiff received another caudal epidural steroid injection for his back pain from Dr. Chien on September 26, 2012.  (Tr. 648–50).

On October 25, 2012, plaintiff presented to BJC Behavioral Health Services to establish care with a new psychiatrist, Delaina Jewkes, M.D.  (Tr. 618–24).  Dr. Jewkes noted that plaintiff had previously received care from Dr. Flynn from 2010 to April 2012, but wanted to switch psychiatrists since he was upset with how she "coerced him" into admitting himself to a residential care facility due to his drinking and repeated self-harming gestures and statements.  In reviewing the history of plaintiff's illness, Dr. Jewkes noted that plaintiff's alcohol use had been significant and impairing.  His longest period of sobriety since the age of 20 was nine months. He also began experiencing mood fluctuations in his 20's with episodes that lasted not more than one week.  Plaintiff was unable to fully describe whether or not he

had had intense periods of mood fluctuation during sobriety.  When he was heavily drinking, he described his moods as fluctuating daily.  Despite any coercion from Dr. Flynn, plaintiff had sought treatment at a residential care facility since April.  A psychiatrist had added Vistarail and Klonopin to his medication regimen.

Plaintiff reported to Dr. Jewkes that he was doing well overall.  He woke up between 3:00 and 6:00 every morning and usually went to bed around 11:00 P.M. He liked waking up early so he had time to himself to play with his phone, interact with staff, smoke a cigarette, make coffee, shower, and get chores down before breakfast.  He liked to spend his afternoons with his girlfriend, with whom he'd been living for the last three months.  Plaintiff also went out with his parents and attended chemical dependence groups several times a week.  Plaintiff reported that his concentration was poor, but it was unclear whether this was chronic in nature. Plaintiff stated that his energy was dependent on his activities for the day.  If he was motivated to do something, he had adequate energy to do the task.  Plaintiff reported that he had been sober for the last seven months and his mood had improved over the last several months with less fluctuation.

Upon examination, Dr. Jewkes noted that plaintiff was obese, well-groomed, appropriately attired, made fair eye contact, was calm, cooperative, and appeared somewhat drowsy.  Scars were noted on his left forearm where he had cut himself while intoxicated in the past.  His affect was stable and congruent.  His insight and judgment were fair, as he recognized his need for medications, treatment, follow up and adherence.  His attention and concentration appeared intact per the interview. Dr. Jewkes found that plaintiff's mood disorder occurred primarily in the context of alcohol use, intoxication or withdrawal.  Nothing plaintiff reported met the criteria

for a full manic episode. As such, Dr. Jewkes opined that it was not clear whether plaintiff met the criteria for bipolar disorder type II versus a substance-induced mood disorder due to his significant chronic alcoholism. Plaintiff also had features of a cluster B personality disorder with evidence of manipulative and demanding behaviors consistent with personality disorder not otherwise specified. Dr. Jewkes planned to continue plaintiff on Depakote, Campral, Gabapentin and Risperdal. She decreased his Vistaril to an as-needed basis and decreased his Clonazepam with plans to taper and discontinue given his history of significant alcohol use. Plaintiff continued to smoke tobacco daily.

Plaintiff sought treatment for decreased urine output from Parkland Health Center on November 17, 2012. (Tr. 735–45). He had concerns of acute renal failure, but was instead diagnosed with hypokalemia and discharged in stable condition. At a follow up appointment with Dr. Jewkes on November 26, 2012, plaintiff reported that overall things were going fine. (Tr. 625–28). He had been adherent with his medications and found them helpful. He denied any side effects aside from dry mouth. He reported that his mood continued to fluctuate. His sleep was poor most days and his energy chronically low. Dr. Jewkes continued plaintiff on his medications and noted that he was beginning individualized dialectical behavior therapy. She discussed lab results with plaintiff and encouraged him to exercise daily. Plaintiff received another caudal epidural steroid injection from Dr. Chien for back and hip pain on November 27, 2012. (Tr. 645–47).

On December 21, 2012, Robert Cottone, Ph.D., reviewed the medical evidence and opined that plaintiff had a mild restriction of daily living activities, moderate difficulties in maintaining social functioning, moderate difficulties in

maintaining concentration persistence or pace, and one or two repeated episodes of decompensation of an extended duration. (Tr. 88–89).

Dr. Cottone also completed a mental residual functional capacity assessment for plaintiff on December 21, 2012. (Tr. 93–95, 107–09). Dr. Cottone opined that plaintiff was not significantly limited in his ability to remember locations and work-like procedures or understand and remember very short and simple instructions. However, plaintiff was markedly limited in his ability to understand and remember detailed instructions. With respect to plaintiff's sustained concentration and persistence limitations, Dr. Cottone noted that plaintiff was not significantly limited in his ability to carry out very short and simple instructions, but was markedly limited in his ability to carry out detailed instructions. Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods. Plaintiff was not significantly limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.

Dr. Cottone further noted that plaintiff was moderately limited in his ability to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Plaintiff was not significantly limited in his ability to make simple work-related decisions. With respect to plaintiff's social interaction limitations, Dr. Cottone found that plaintiff was moderately limited in his ability to interact appropriately with the general public, to accept instructions and respond

appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. He was not significantly limited in his ability to ask simple questions or request assistance.

As to plaintiff's adaptation limitations, Dr. Cottone opined that plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. Plaintiff was not significantly limited in his ability to be aware of normal hazards and take appropriate precautions and to travel in unfamiliar places or use public transportation. Dr. Cottone also added that plaintiff should avoid work involving intense or extensive interpersonal interaction, handling complaints or dissatisfied customers, close proximity to co-workers, and close proximity to available controlled substances. Plaintiff could understand, remember, carry out and persist at simple tasks, make simple work-related judgments, relate adequately to co-workers or supervisors, and adjust adequately to ordinary changes in work routine or setting.

On December 28, 2012, a consultative examiner completed a physical residual functional capacity assessment of plaintiff. (Tr. 90–93, 104–07). The examiner found that plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand, walk, or sit about 6 hours in an 8-hour workday, and push or pull an unlimited amount of time. Per plaintiff's postural limitations, he could occasionally climb ladders, ropes or scaffolds, and was unlimited in his abilities to climb stairs, balance, stoop, kneel, crouch and crawl. Plaintiff was

unlimited in his environmental limitations, except that he should avoid concentrated exposure to hazards such as machinery and heights. Based on the strength factors of plaintiff's physical RFC, plaintiff demonstrated the maximum sustained work capability for light work. (Tr. 96, 110). Considering the totality of the evidence in the record, plaintiff's statements regarding his symptoms were deemed only partially credible, as they were not all fully supported by the medical evidence in his file. (Tr. 90, 104).

At a follow-up appointment with Dr. Jewkes on December 31, 2012, plaintiff reported that he had broken up with his girlfriend but was coping well. (Tr. 863–66). His girlfriend had told him he was getting in the way of her recovery. Plaintiff thought they would get back together later. He had been adherent with his medications and found them helpful. He reported daily fluctuating moods and denied any alcohol use. Plaintiff had been adherent with his dialectical behavior therapy and was utilizing his coping skills appropriately. His sleep was still poor, energy low, and he had not been exercising. Dr. Jewkes noted that plaintiff had noted experienced any psychotic symptoms outside the context of substance use or withdrawal. The doctor continued plaintiff's medications with plans to taper Risperdal. She encouraged plaintiff to keep a food journal for her to review at his next appointment.

In a treatment plan review dated January 10, 2013, community support specialist Mark Wardlow noted that plaintiff had attended approximately 30 group therapy sessions, nine individual sessions, and met with his community support specialist 18 times from August 3 to November 3, 2012. (Tr. 925). During these sessions, plaintiff worked primarily on his issues with substance abuse. Plaintiff

remained sober during this time period, but had difficulty regulating his mood consistently. Plaintiff acted as the "loan shark" for the residential care facility he lived in, frequently loaning money to other residents. Plaintiff stated that he controlled his worrying well during this review period, because his focus and attention were occupied well.

At his next appointment with Dr. Jewkes on January 30, 2013, plaintiff stated that he was depressed about his lab tests. (Tr. 867–72). He was also upset that his ex-girlfriend had used him for money. He stated that he used his skills from individual therapy and was able to get through it. Plaintiff now felt closure and his mood was better. He had not been getting much physical exercise, but wanted to improve his physical fitness. Dr. Jewkes maintained plaintiff's medication regimen. In a treatment plan review dated February 8, 2013, reviewing the past three months, it was noted that plaintiff met with his community support specialist more than 25 times and attended 31 group therapy sessions. (Tr. 926–28). Plaintiff used his therapy skills in many documented instances to aid his mood stabilization and to assist him with his substance abuse. Plaintiff had minor instances where he had an inability to control his instinct to jump to conclusions and became upset. During this review period, plaintiff had three instances in which he had consumed alcohol to the point of intoxication. Plaintiff admitted to the use and had positive coping skills with the instances. Plaintiff stated that he struggled regularly with depression and found it difficult to enjoy activities outside of BJC and his apartment.

On February 13, 2013, plaintiff told Dr. Jewkes that he had been hearing things. (Tr. 872–77). He confessed to drinking alcohol three times the past winter

with the most recent instance in January. He had been more emotional lately. Plaintiff had been working with a therapist, talking with family, and going to groups. He struggled with self-esteem issues and was afraid to disclose his relapse since he did not want to return to the residential care facility. Plaintiff's sleep was still dysregulated, and he had not been using the sleep hygiene habits Dr. Jewkes had talked to him about. Plaintiff had been trying to walk more and felt better with exercise. He was having BJC help manage his finances so he was less likely to use alcohol. Plaintiff reported hearing sounds such as music, dogs barking, and a woman screaming when he was alone and it was quiet. Dr. Jewkes noted that plaintiff had talked himself into thinking his auditory hallucinations were a misperception of sounds in the environment. Plaintiff had experienced this in the past when medication changes were made. Dr. Jewkes discussed with plaintiff that close observation was more appropriate now than making any medication adjustments. The doctor planned to consider increasing plaintiff's dosage of Risperdal if psychotic symptoms worsened. She encouraged plaintiff to attend group therapy regularly for his alcoholism and applauded him for sharing his recent relapse.

Plaintiff reported no drinking or drug use since his last visit at his next appointment with Dr. Jewkes on March 4, 2013. (Tr. 878–83). He had recently had a testosterone injection and noted a significant improvement in his mood and energy for the last few weeks. He had also been less emotional recently. Plaintiff denied any recent cravings, except for chocolate. His sleep was still dysregulated, but he averaged eight hours a day. Plaintiff was currently taking Gabapentin 900 mg three times a day, which helped with pain but was somewhat sedating during

the day.  Plaintiff smiled and joked during his appointment.  He described his mood as "here."  Dr. Jewkes continued plaintiff on his medications.

At his appointment with Dr. Jewkes on March 29, 2013, plaintiff stated that his grandmother had died since his last visit.  (Tr. 884–90).  However, he handled her death well by utilizing his therapy skills.  Plaintiff was proud of himself for not drinking or misusing his medications.  He stated that he had learned how to be peaceful, which substantially helped.  He continued to spend time with family and go to groups.  His energy levels were variable, but he was walking a little more.  Plaintiff wanted to discuss how to deal with his brother, who was drinking heavily.  He smiled and joked during the appointment, and set goals for improving his physical well-being.

On April 1, 2013, plaintiff presented to Andrew Ninichuck, M.D., at Washington County Memorial Hospital with back pain of moderate severity.  (Tr. 946–51).  The pain was aggravated with bending, twisting and walking, and was relieved by pain medications and rest.  Upon a review of plaintiff's systems, Dr. Ninichuck noted that plaintiff had extremity weakness, anxiety, depression, back pain, and joint pain.  The doctor assessed plaintiff with lumbago, exposure to hepatitis C, anxiety, and hyperlipidemia.  The doctor referred plaintiff to Dr. Greenlee and ordered lipid and hepatitis panels.

At an office visit on April 9, 2013, Dr. Greenlee assessed plaintiff with lumbago, nonallopathic lesions of the thoracic region, and pain in the thoracic spine.  (Tr. 675–80).  The doctor planned to provide plaintiff acupuncture on his lumbar spine to help with inflammation.  Plaintiff complained of continued intermittent, moderate, aching back pain to Dr. Greenlee on April 12, 2013.  (Tr.

669–74).   Dr. Greenlee planned to continue to provide acupuncture to see how plaintiff responded.   Plaintiff received acupuncture on his lumbar spine at Dr. Greenlee's office on April 16 and 19, 2013 to decrease inflammation.  (Tr. 658–68).

Plaintiff presented to the emergency room at Parkland Health Center on April 21, 2013 with chest congestion, a productive cough, shortness of breath, and sharp chest pain and was admitted to the hospital for two days.   (Tr. 705–32).   He initially was thought to have abnormal chest radiographic findings.   He had a normal complete blood count without evidence of leukocytosis.  Plaintiff was treated with nebulized bronchodilators and steroids in the emergency room.   Thereafter, plaintiff was admitted to the hospital.   On admission, plaintiff was maintained on supportive respiratory measures and his routine medications for underlying chronic medical problems.   Subsequent evaluation included a chest CT scan that demonstrated no evidence of acute intrathoracic pathology with no evidence of infiltrative process or consolidation.   No evidence of pulmonary embolism was noted.   Plaintiff remained clinically stable, and his present respiratory symptomatology had mostly resolved.  Overall, he was deemed medically optimized for discharge home with follow up on an outpatient basis.  Plaintiff was diagnosed on discharge with presumed acute reactive airway disease, related pleuritic chest pain, chronic hypertension, corrected hypophosphatemia, bipolar disorder, a history of arthritis, morbid obesity, and ongoing tobacco use.

At a urologist appointment on May 7, 2013, Dr. Neuman noted that plaintiff had initially reported tremendous improvement in his mood, energy and libido with testosterone injections.  (Tr. 931–32).  However, with the second and third months of injections there was a much less impressive reaction and mood elevation.   The

doctor questioned whether the bottle of testosterone was kept refrigerated and whether the expiration date had passed. It was noted that plaintiff did suffer a range of psychiatric issues that could be at play. Plaintiff was given a renewed dose of testosterone.

On May 31, 2013, plaintiff reported to Dr. Jewkes that he had not consumed alcohol or used drugs since his last visit. (Tr. 890–96). He had been getting out more and started fishing. He was also back in contact with his ex-girlfriend. His mood and sleep had been good with fair energy levels. Plaintiff's brother was now enrolled in a rehabilitation program. Per review of plaintiff's general appearance, Dr. Jewkes noted that plaintiff was smiling, joking, appeared tan, and had grown a beard. Plaintiff described his mood as "great." Dr. Jewkes decreased plaintiff's Vistaril and Risperdal prescriptions. The doctor also discussed with plaintiff that she was moving and plaintiff would start seeing a new psychiatrist in July. Plaintiff understood that he could call Dr. Jewkes with any questions or concerns prior to the end of June.

At an appointment with Dinu Gangure, M.D. at BJC Behavioral Health Services on June 15, 2013, plaintiff stated that he was doing well and denied being depressed. (Tr. 897–98). He took his medications as prescribed and denied recent alcohol use. His insight was noted as fair and judgment adequate. Plaintiff was currently able to maintain focus, attention and concentration. Plaintiff appeared interested in his well-being, was in control of his behavior, and wanted to stay on Risperidone. On July 24, 2013, plaintiff told Subhash Bashyal, M.D. at BJC Behavioral Health Services that he was feeling wonderful. (Tr. 899–900). Plaintiff had graduated from his therapy program yesterday and felt good about that. His

parents were with him and thanked the medical providers for "giving our son back." Plaintiff stated that he had been almost seven months sober. He felt therapy had helped him learn how to express himself and not manipulate people. He was also more aware of his feelings and how to manage them. Plaintiff reported that he did have periods of decreased sleep and depressed mood and energy, but the majority of these periods had been in the context of alcohol use. Per lab tests Dr. Bashyal ordered, plaintiff had low HDL cholesterol and high triglycerides. (Tr. 699–702).

On July 31, 2013, plaintiff reported to Dr. Bashyal that he had been feeling good and was undergoing evaluation for lap band surgery. (Tr. 900–04). Plaintiff denied any temptations to drink again. He had been sleeping well, his appetite was good, and he had no other health concerns at this time. Dr. Bashyal planned to continue plaintiff on his medications and follow up in six weeks. A community support specialist review dated August 3, 2013 noted that plaintiff had attended his group therapy weekly for the past three months. (Tr. 928–30). Plaintiff had saved money and was able to buy a shotgun he wanted. Plaintiff was told his had diabetes during this review and was prescribed Metformin. Plaintiff stated that he felt "happy most days" during this period. He had been taking care of himself and his apartment. He interacted well in the groups he attended. It was noted that plaintiff had made significant gain in improving his sense of self-worth.

Plaintiff had gastric lap band surgery on August 21, 2013. On September 4, 2013, plaintiff told Dr. Bashyal that surgery went well. (Tr. 904–09). He had been "restricting his appetite, drinking protein shakes." Plaintiff felt that he had been able to take care of himself. His mood had been good, he spent the weekend with his family, and he had stayed away from alcohol. Upon a review of plaintiff's

systems, plaintiff had some reflux, malaise, no chest pain, and no shortness of breath. Plaintiff described his mood as "fine." Dr. Bashyal continued plaintiff on Depakote, Risperidone, Clonazepam and Neurontin. Plaintiff's chemistry labs and valproic acid levels tested were within normal limits. (Tr. 696–98).

On September 20, 2013, plaintiff presented to the emergency department at Mineral Area Regional Medical Center with generalized weakness. (Tr. 808–10). He had been having some vague, confusion-like symptoms, anxiety, and nonspecific decreased functionality for several days. It was noted that plaintiff was a poor historian. Plaintiff was concerned that he could not seem to "snap out of it" as he had before. Upon physical exam, it was noted that plaintiff's presentation was of an overwhelming psychogenic character and anxious. Plaintiff requested a short course of Xanax, but the emergency room doctor would not interfere with plaintiff's outpatient medication management. Plaintiff declined evaluation by a crisis counselor. As such, the doctor recommended that plaintiff consult with his mental health care providers.

On October 14, 2013, plaintiff was diagnosed with a square mass in his right upper abdominal wall measuring three centimeters and a cutaneous lesion in his right forearm measuring 0.8 centimeters. (Tr. 793–800). William C. Sippo, M.D. excised the abdominal wall tumor and benign lesion on plaintiff's right forearm. For the cyst on plaintiff's right abdominal wall, the doctor considered it worthwhile to address at that time because it was quiescent and not infected. For the lesion on plaintiff's right forearm, the doctor wrote that it needed excision to definitively rule out skin cancer and control the lesion. A biopsy of the skin of plaintiff's right arm

indicated chronic folliculitis, and the excision of the skin of plaintiff's right abdomen indicated an epidermal cyst.  (Tr. 791–92).

On October 16, 2013, plaintiff presented to Parkland Health Center with complaints of shortness of breath, weakness, dizziness, a cough, sore throat, and a runny nose.  (Tr. 686–95).  Plaintiff also had high blood pressure.  An x-ray of his chest was normal.  Plaintiff was diagnosed with acute bronchitis and a tobacco use disorder, prescribed medication and was discharged.  On October 28, 2013, plaintiff told Dr. Bashyal that he felt more anxious.  (Tr. 909–14).  He reported problems with sleep since he had been thinking about things he needed to do at night. Plaintiff had been attending meetings and groups at BJC, which he found helpful. Plaintiff stated that he was concerned that he would not do well during the wintertime and requested an increase in his Risperdone prescription.  Dr. Bashyal continued plaintiff on his medications and planned to follow up with plaintiff in four weeks.  On October 30 and November 6, 2013, plaintiff returned to Dr. Chien with complaints of low back pain and was given caudal epidural steroid injections with corticosteroid injection of the right L4 nerve root.  (Tr. 781–85, 801–07).

On December 2, 2013, plaintiff reported to Dr. Bashyal that he had had "a few panic attacks" since his last visit.  (Tr. 914–19).  Plaintiff stated one panic attack occurred when he had his stitches taken out from the surgery removing a cyst and a wart.  Plaintiff reported that his mood had been better since the increase in his Risperidone.  His sleep continued to be dysregulated, and he slept better in the mornings.  Plaintiff cooked for his family for Thanksgiving.  Plaintiff denied any other stressors in his life at that time, had been busy, and felt that he had been coping well.  He reported that he was doing well on his current medication and with

sobriety.  Dr. Bashyal noted that plaintiff's symptoms were controlled on his current regimen and continued plaintiff's medications with plans to follow up in six weeks.

After the ALJ's decision, but prior to the Appeals Council's decision, plaintiff submitted an additional mental medical source statement from Subhash Bashyal, M.D. on July 18, 2014.  (Tr. 17–22).  Dr. Bashyal opined that plaintiff was moderately limited in his ability to function independently and adhere to basic cleanliness standards.  Plaintiff was markedly limited in his ability to behave in an emotionally stable manner.  As to social functioning, plaintiff was moderately limited in his ability to relate to family, peers, or caregivers, to ask for simple questions or requests for help, and to maintain socially acceptable behavior.  Full time at a job, Dr. Bashyal opined that plaintiff could perform in a task-oriented setting where contact with coworkers was only casual and infrequent.  Plaintiff could perform in a setting where supervisors provide simple instructions for non-detailed tasks with no more than four supervisor contacts per day, but could not perform work in a setting with any contact with the general public.

As to plaintiff's concentration, persistence and pace, Dr. Bashyal wrote that the length of time plaintiff could continue before needing either task redirection or some other form of additional supervision was variable.  Plaintiff's overall pace of production was 31% or more below average.  With respect to reliability, plaintiff's psychologically based symptoms would cause him to miss three or more days of work a month and be late to work or need to leave early three times or more.  Dr. Bashyal stated that these limitations had existed since 2006.  The doctor's most current diagnoses of plaintiff's mental impairments included bipolar disorder,

alcohol dependence in remission, post-traumatic stress disorder, and borderline personality disorder.

## III.  <u>The ALJ's Decision</u>

In the decision dated February 6, 2014, the ALJ made the following findings:

1. Plaintiff met the insured status requirements of the Social Security Act through June 30, 2013.

2. Plaintiff has not engaged in substantial gainful activity since August 12, 2011, the alleged onset date.

3. Plaintiff has the following severe impairments: mood disorder, personality disorder, alcohol dependence, degenerative joint disease of the lumbar spine and right knee, hypertension, diabetes mellitus, and obesity.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except for lifting or carrying more than 20 pounds occasionally and 10 pounds frequently; standing or walking more than 6 hours in an 8-hour workday with normal work breaks; climbing ladders, ropes, or scaffolds; climbing ramps or stairs, stooping, kneeling, crouching, or crawling more than occasionally; and performing more than simple, routine work with no intense interpersonal interaction, handling complaints from customers, or working in close proximity to co-workers.

6. Plaintiff is unable to perform any past relevant work.

7. Plaintiff is 39 years old, born on September 28, 1974, which is defined as a younger individual age 18–49.

8. Plaintiff has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability, because using the Medical-Vocational Rules as a framework supports a finding that plaintiff is "not disabled," whether or not plaintiff has transferable job skills.

10.　Considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

11.　Plaintiff has not been under a disability, as defined in the Social Security Act, from August 12, 2011, through the date of the ALJ's decision.

(Tr. 25–43).

## IV.　Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th

Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional

restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V.    Discussion

Plaintiff argues that the ALJ erred by failing to account for deficits of concentration, persistence, or pace in the RFC finding.  In the RFC assessment, the ALJ found that plaintiff could perform light work, except for lifting or carrying more than 20 pounds occasionally and 10 pounds frequently, standing or walking more than 6 hours in an 8-hour workday with normal work breaks, climbing ladders, ropes or scaffolds, climbing ramps or stairs, stooping, kneeling, crouching or crawling more than occasionally, and performing more than simple, routine work with no intense personal interaction, handling complaints from customers, or working in close proximity to coworkers.  (Tr. 34).

Plaintiff contends that the ALJ acknowledged that plaintiff experienced moderate functional deficits in concentration, persistence or pace, but failed to include these functional deficits in either the RFC finding or in hypothetical questions posed to the vocational expert.  With respect to plaintiff's mental limitations, the ALJ found that plaintiff's severe impairments included mood disorder, personality disorder, and alcohol dependence.  (Tr. 30).  In determining whether plaintiff's mental impairments met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, the ALJ found that plaintiff had moderate difficulties with regard to concentration, persistence, or pace. (Tr. 33).  In making these findings, the ALJ relied on the psychiatric review technique and gave great weight to the opinion of the state agency psychological consultant, Dr. Cottone.  (Tr. 33–36).

On December 21, 2012, Dr. Cottone reviewed the medical evidence and opined that plaintiff had a mild restriction of daily living activities, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration persistence or pace. (Tr. 88–89). As summarized in the Court's review of the medical evidence above, Dr. Cottone also completed a mental RFC assessment for plaintiff. (Tr. 93–95, 107–09). Based on plaintiff's concentration and persistence functional limitations, Dr. Cottone opined that plaintiff was markedly limited in his ability to carry out detailed instructions. Plaintiff was moderately opined in his ability to maintain attention and concentration for extended periods, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them, and to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Plaintiff was not found significantly limited in his ability to carry out very short and simple instructions, to perform activities within a schedule, maintain regular attendance, and to be punctual within customary tolerances or to make simple work-related decisions.

In the additional explanation section of the mental RFC assessment, Dr. Cottone wrote that plaintiff could understand, remember, carry out and persist at simple tasks, make simple work-related judgments, relate adequately to co-workers or supervisors, and adjust adequately to ordinary changes in the work routine or setting. In providing great weight to Dr. Cottone's opinion, the ALJ consistently found that plaintiff's mental impairments limited him to simple, routine work with limited interaction with others. Besides the weight given to the psychological

consultant's opinion, the ALJ considered objective medical evidence in the record, treatment notes and plaintiff's response to medications.  Treatment notes indicate that plaintiff's symptoms and conditions improved with therapy and medication without significant side effects.  Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.").  On numerous occasions in the records, medical providers noted that plaintiff only experienced significant psychiatric issues while using alcohol, being intoxicated, or experiencing symptoms of withdrawal.  42 U.S.C. §§ 423(d)(2)(C), 1382(a)(3)(J) ("An individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled."); see also Kluesner v. Astrue, 607 F.3d 533, 537 (8th Cir. 2010) (citing Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002)) (stating that to establish qualification for disability benefits, the claimant has the burden to prove that alcoholism or drug addiction is not a contributing factor).

The ALJ further evaluated plaintiff's credibility and found his allegations regarding disability based on mental impairments to be not credible.  (Tr. 30–36). In contrast to plaintiff's contentions, his daily activities indicated that he could live and function independently.  When taken as prescribed, plaintiff reported effective results from use of his medications.  With consistent therapy and sobriety, plaintiff admitted to improvement in his symptoms.  Plaintiff routinely sustained attention and concentration with logical thought process, intact memory, normal speech, and an affable manner during medical appointments.  Overall, the ALJ properly

considered the medical opinions, treatment notes, and objective medical evidence in discrediting plaintiff's subjective complaints. See Polaski v. Heckler, 739 F.3d 1320, 1322 (8th Cir. 1984) (requiring an adjudicator to consider a claimant's daily activities, the duration, frequency and intensity of pain, precipitating and aggravating factors, dosage, effectiveness and side effects of medication, and functional restrictions in evaluating the credibility of a claimant's testimony and complaints). Because the ALJ provided good reasons for discounting plaintiff's credibility, the Court defers to the ALJ's credibility findings. Renstrom, 680 F.3d at 1067.

The ALJ also properly incorporated the same mental limitations found in plaintiff's RFC into a hypothetical question posed to the vocational expert at the hearing. Specifically, in the first hypothetical, the ALJ instructed Ms. Bernard-Watts to consider an individual who was limited to simple, routine tasks and must avoid work involving intense interpersonal interaction, handling complaints of dissatisfied customers, and close proximity to coworkers. (Tr. 77). The vocational expert responded that such an individual, with additional physical limitations cited by the ALJ, could not perform plaintiff's past relevant work, but would be able to perform the duties of a garment sorter or slot-tag inserter. While "a hypothetical question must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant," Howard v. Massanari, 255 F.3d 577, 581–82 (8th Cir. 2001) (internal citations and quotation omitted), the ALJ need not incorporate limitations into a hypothetical that the ALJ properly did not find credible. McCoy v. Astrue, 648 F.3d 605, 617 (8th Cir. 2011). Based on the record, the ALJ's hypothetical concerning someone who was capable of performing

simple, routine tasks with limited interaction with others adequately captures plaintiff's deficiencies of concentration, persistence or pace.  See Brachtel v. Apfel, 132 F.3d 417, 421 (8th Cir. 1997) (holding that a hypothetical including the "ability to do only simple routine repetitive work, which does not require close attention to detail" sufficiently describes deficiencies of concentration, persistence or pace).

## VI.   Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.


_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE


Dated this 9th day of September, 2016.